The Honorable Court, all rise! The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near, give their attention, and they shall be heard. God save the United States of America and this Honorable Court. Good afternoon. Please be seated. Today's cases will be called as previously announced, and the times will be as allotted to counsel. Today's case is No. 16-6001, United States v. Zohar A. Tsarnaev. At this time, would Mr. Habib please introduce himself on the record to begin? Good morning. Daniel Habib on behalf of Zohar Tsarnaev. May I reserve five minutes for rebuttal? Yes, you may. Thank you. And may it please the Court. With the Court's leave, I intend to focus this afternoon on Point 2, the juror misconduct claim. This case was tried in Boston on a promise made by the District Court and accepted by mandamus panels of this Court that despite the extraordinary impact of the Marathon bombings on this community, a thorough and searching voir dire would identify and remove unqualified jurors. That promise was not kept. While jury selection was ongoing, the defense presented the District Court with uncontroverted documentary evidence that two veneer persons who would become seated jurors lied during voir dire. Juror 286, the foreperson, falsely denied having published 22 Twitter posts about this case, one of which referred to Tsarnaev, then 19 years old, as, quote, a piece of garbage. This juror also denied having sheltered in place with her family during the manhunt for Mr. Tsarnaev. Should we make a distinction between an original posting and a retweet? So it's true that some of the jurors' posts were retweets, Your Honor, but the juror republished those posts under her own Twitter profile for all of her followers to read. She did not have in her profile the disclaimer that one sometimes sees to the effect that retweets are not endorsements, and the juror posted this particular tweet without comment or qualification. So in these circumstances, the most reasonable reading of the tweet is that the juror endorsed what it said. The question that she answered, one of the questions that's drawing your attention, is the answer when she said she doesn't believe she's commented on the case. Which of her tweets or retweets would you direct us to as examples of her commenting on the case? I would direct this court to the tweet that she, an original tweet that she posted on April 15th, in which she referred to Martin Richard as, quote, little eight-year-old boy who was killed at the marathon with a Sappan Hill Little Leaguer, RIP little man, hashtag Dorchester. And how are you construing comment on the case to have that comment be a comment on the case? Your Honor, I think the jurors, in the context of a questionnaire designed to elicit their opinions about this matter and their fitness for jury service, would have taken a common sense understanding of the term case to refer to the marathon bombings. Indeed, that's how the Supreme Court described question 79 on the questionnaire, as asking whether the jurors had commented online about the bombings. In addition, the tweet that referred to Tsarnaev as a, quote, piece of garbage, was most certainly a comment on this case in that it referred to the capital defendant whose life lay in the jurors' hands in dehumanizing terms that would have made it easier to impose a death sentence. Let me also take a step back and reiterate that the principal question before this court is not whether, on this record, Mr. Tsarnaev can conclusively establish bias. To be sure, we believe that he can, and the remedy for that structural error would be vacatur of the death sentence. Rather, under this court's decisions, including this court's recent decision in Maldonado, Pena, the question is whether Mr. Tsarnaev came forward with a colorable or plausible claim of juror misconduct sufficient to trigger the district court's unflagging duty to conduct investigation. And Mr. Tsarnaev surely did that. If I could speak for a moment about what the remedy would be in that situation, I believe that there are two potential remedial paths open to this court. One would be, if this court agrees that Mr. Tsarnaev has satisfied French's bar for inquiry, then a remand for an evidentiary hearing would, at a bare minimum, be necessary. However, this court's precedents, in particular Rhodes, Gaston Brito, and Bristol Martyr, also afford this court discretion to vacate the death sentences rather than remand for an evidentiary hearing based on the constitutional error that occurred when deficient ordeal was conducted in this case. In our view, vacatur is an appropriate remedy here in light of the eight years that have passed since jury selection, in light of the presumptively prejudicial communication between juror 138 and a Facebook friend, and in light of the fact that Mr. Tsarnaev raised this claim during voir dire, not mid-trial, not post-trial, and not on collateral review. But while jury selection was ongoing, and the remedy for deficient voir dire is typically vacatur rather than remand. You refer to the plausibility of colorability standard. How do you align that with the abuse of discretion standard that we're also required to apply in reviewing a judgmental decision of a district court judge? When under the colorable or plausible claim standard, when a defendant comes forward with a non-frivolous allegation of jury misconduct, the district court's discretion is circumscribed. But doesn't it have discretion to undertake the analysis that you say or the investigation that the court should have done? The court first needs to make a determination that there is, has been raised, the record raises a plausible or colorable problem of this type. Yes. That assessment, don't we review that assessment to see if it was an abuse of discretion? Yes. The district court, to the extent that the court concluded no such claim had been raised, committed errors of law and clear errors of fact. For example, in assessing whether Juror 286 was qualified, the district court erred as a matter of law in failing to answer questions that this court has said must be asked in order to make a biased determination. That is, in particular, the reason for the juror's dishonesty and the scope and severity of the juror's dishonesty. And so, for example, the holding of this court's decision in French I is that the district judge abused his discretion in failing to conduct additional inquiry where there was an inaccurate answer, which the government concedes was given here, where the inaccuracy was likely, although not definitely knowing, and where the district judge was unable to say why the juror answered as she did. In those circumstances, French said, a district court cannot, lest it abuse its discretion, dispense with the constitutionally necessary inquiry into bias. The inquiry that you are explicating seems to me to fit within prong one of McDonough, and wouldn't it be better to read French to include both prongs? And so if the court determines that the second prong of McDonough would not be satisfied in any event, why does it have to go through the first prong? The district court on this record could not, as a matter of law, say that the second prong of McDonough could not be met because the district court did not know the answers to key questions. So with respect to Juror 286, the district court did not know why the juror had failed to disclose her Twitter posts. But isn't the question, assume dishonesty, and had the question been answered honestly, then would it have been reason to conclude bias? Isn't that the question under the second prong? The ultimate question is whether the juror should have been excused for cause. One component of that question, as McDonough indicates, is what the impact of truthful answers would have been. But under this Court's decision in Sampson 2, the dishonesty itself is highly material to the bias inquiry. So the district court cannot simply put the dishonesty aside and then ask whether if the juror had disclosed all that she was required to disclose, she could have been seated. Let me also... Well, I was going to move on to a different point, but... Let me then, if I may, Your Honor, say one thing about Juror 138, which is that the communication that occurred between Juror 138 and his Facebook friend was of the kind that this Court has deemed presumptively prejudicial. In O'Brien, this Court clearly stated that where there is a communication about the case between a juror and someone not associated with the case, that that communication would be deemed prejudicial unless shown to be harmless. And here, there was no inquiry made with Juror 138 to determine the impact of that communication. Well, that can't be taken literally. I mean, if someone contacts a juror and said, Hey, I hear you're sitting on such-and-such a trial when it starts. Is that true? That wouldn't be presumptively prejudicial. What occurred in this case, of course, was far worse, Your Honor. Right, but I think you can't... Don't you have to agree that you're a bit overbroad with your categorical statement that any communication to a juror, we have to look at the substance of the communication and make some assessment of whether it's prejudicial. In the example that Your Honor posited, a court might be able to say in those circumstances, again, depending on the specifics of the communication, that it was not about the case. In fact, in this very case, didn't the judge expressly tell the jurors that they could have such communications? No, Your Honor. The district judge, before this conversation occurred, and I wish to be clear on that point because the government muddles it in its supplemental reply brief, before this communication occurred, the district judge instructed all the jurors that they were to avoid discussion of the case, including on Facebook. The juror courted discussion of the case on Facebook and received a suggestion that is far different from the one, Judge Kayada, that you posited. This juror was told by a friend, play the part, get on the jury, and send him to jail where he will be taken care of. It's difficult to imagine a more poisonous suggestion made to someone who will sit as a juror in a capital case, and that communication cried out for inquiry. Well, the judge told that juror that he could tell others that he may be a juror in the case. He did, and in the same instruction, he told the juror that he was to avoid discussion of the case, including on Facebook. But if a judge tells a juror you can tell others about being on the case and he's doing it on Facebook, he doesn't allow someone to contact back. Someone sends a message back, an email back. This particular communication began when the juror returned to a Facebook discussion that had gone quiet, introduced additional information that had arisen during the court session he had attended that morning, and, in a sense, restarted a conversation. The Supreme Court in Packingham described social media as the modern public square, and if a juror walked into a bar and announced that he was a prospective juror in the Sarnia prosecution and then sat and waited, I think we would all understand that to be inviting communication about the case, and what occurred here is not materially different. If I may also clarify one thing, Judge Kayada, the principal issue with respect to Juror 138 is not whether he believed he was following the instruction or whether he disobeyed the instruction. The principal issue is once he heard a suggestion from a friend to manipulate the voir dire process and punish a capital defendant, when that information was brought, and when he was questioned about that information, he denied that the communication occurred. When that communication and the denial was brought to the attention of the district judge while voir dire was still ongoing, did the judge have discretion to look the other way? He did not. I'd asked you earlier how you interpreted the judge's reference to, or the questioner's reference to, talking about the case. This juror, the relevant instruction, the relevant question, referred to any comments about this trial. How are we to construe the term, this trial? So if I may be precise, Your Honor, the question that we've highlighted, and it appears at 3A1148, the judge is questioning the juror about his social media use. And the judge asks, what is the nature of your use of it? Is it essentially personal, social-type things? Yeah, I see what my friends are doing and commenting on that. And the question to which I've drawn this Court's attention at line 20 is anybody commenting about this trial? Right, and so how do you construe this trial? At a minimum, trial encompasses how the juror will vote in the trial, which is what the friend is purporting to advise him on. So you're saying at a minimum, it's the proceeding that would begin with openings once a jury was selected. And you might advocate for a broader interpretation, I'm guessing. At a bare minimum, a trial encompasses the verdict, and the verdict is the subject of this communication. I think it's also correct to construe the trial to include the jury selection process, which was also the subject of the friend's suggestion. But again, the burden on Mr. Tsarnaev in the District Court and now before this Court was not to conclusively establish the juror had disobeyed an instruction or that the juror was unqualified to serve. His burden was to come forward with a colorable or plausible claim of misconduct. He did so while the jury selection process was ongoing. In those circumstances, the District Court simply lacked discretion not to pursue this matter. I will also, Judge Howard, I cut off your question, but please. Oh, you can be sure I don't remember it. I'm just curious. If this case were remanded, would the district judge be obligated to give these two jurors a Fifth Amendment warning? If this case were remanded for an evidentiary hearing and the jurors were called on to testify, I think it would be up to the district judge as to how to handle that issue. For example, it would be a question of whether the jurors express the desire for counsel. I would note that the statute of limitations on any perjury prosecution has likely run at this time. But if the case were remanded to the District Court, I think that and related matters would be up to the court, the District Court in the first instance. Mr. Habib, I have had a second to remember the question, I think. You were speaking of a burden of establishing only colorable claim, plausibility, plausible claim of, I think of bias, which to me I think of as the going to the second prong of McDonough, the first prong, the dishonesty prong. Is it the same standard? Is it just plausibility, colorability? Because the cases do seem to talk about establishing. I'm not sure it rises to the level of likelihood, but might that on the first prong, might it be a higher burden? And the reason that I'm asking that question is because the judge here said there are a number of explanations, many of them innocent in essence. I think the best way to answer Your Honor's question is to say that this Court's cases articulating the colorable claim standard speak in terms of misconduct. In this case, the misconduct that we've alleged is, among other things, a failure to disclose pertinent information in response to material toward your questions. And so I think the best thing I can say about the nature of the showing is what this Court held in French. And so again, let me... So in French, again, just to recall, and I know the Court has read it, the juror failed to disclose her son's criminal history. This Court and the District Court conducted no inquiry when that discrepancy was brought to its attention via a motion for a new trial. This Court held that there was an abuse of discretion, and furthermore held that the colorable claim standard had been met because the juror's answer was inaccurate, as the government concedes is true of at least one answer here, the shelter-in-place answer. The inaccuracy was likely knowing, and the District Court was unable to say why she had answered as she did. That is, the Court was unable to say whether or not she was biased. On those facts, this Court held the standard satisfied. Yeah, so I think my question goes to... Because, I mean, I think French I and French II get the standard correctly, but I still overlay McDonough, the Supreme Court decision on French, and it seems to me that at least as to prong one, there has to be more of a showing. In French, there couldn't have been because there was an individual voir dire that had already taken place. There wasn't this opportunity to get at what was going on with that juror. To me, French is completely consistent with McDonough, but I'm not sure this case is because of the factual differences, such as this is a later arising complaint essentially after an individual voir dire had completed, where those questions could have been asked. No, so what I would say, Your Honor, is that this claim is actually more timely than the claim presented in French. This claim, again, was asserted on February 27, 2015, the day of this Court's second mandamus opinion. The jury had not been selected. The parties had not exercised their peremptory strikes. Jurors 286 and 138 were physically present in this courthouse, and inquiry at that time into the matters that the defense raised would have been easy to achieve. In contrast, in French, the motion for new trial was lodged about a month after the information that gave rise to the motion came to the defense's attention. So as to the question whether there was opportunity for inquiry, we made a showing in our opening brief of diligence in developing this information. Our ability to ascertain the content of the juror's social media accounts was hampered by the district court's refusal to order the jurors to disclose to us their social media. I don't quite understand that. Maybe you can help me with this. I may have the juror wrong, but Juror 140, who I think did not give an honest answer about social media accounts, the defense was able to find that, and here there wasn't that kind of representation, and yet it didn't happen. So how is that diligent? I'm not saying that there wasn't diligence. I'm just trying to understand. So the defense in the course of making these motions to strike represented that it made the motions within days of learning the pertinent information. I'm at a point prior to that. I'm sorry. Perhaps you want to clarify. Yes, it made the motion after finding it, but why didn't it find it earlier? It found it with respect to Juror 140. No, both of these motions were made after the individual bargaining occurred with respect to both jurors. The answer is 140 is a different juror than these two, right? Oh, I'm sorry. You're referring to 140. Yes. I see. I misunderstood. I apologize. That's true. The record does not reflect why the defense was able to find that information with respect to 140 and not the others. I will say that as to 286, her Twitter profile name, was not her real name. There was no obvious way to ascertain who she was on Twitter. But it's also the case that there was absolutely... But she acknowledged that she had a Twitter account, didn't she? She said that she used Twitter for social purposes, such as discussing television programs. So that would not have put the defense on notice that it was necessary to look for Twitter posts that were unlikely to pertain to this case. In particular, given that answer and the questionnaire response that she had not commented on this case in an online comment or post. Again, the defense did not have the usernames. The defense was engaged in the many tasks we've detailed in our opening brief attendant to the onset of trial. The defense still, under those circumstances, was able to unearth and present this material to the district court before the jury was selected. And at that juncture, there was no reason for the judge to decline to pose these questions. If I can put the point slightly differently, had this material been presented to the district court at the time Juror 286 was present for individual voir dire, it's inconceivable that the judge would have refused to question the juror about these social media posts. Given the defense's diligence in developing this information, and given the lack of any real incentive for the defense to sandbag this information, what occurred here is not materially different. The defense made quite clear in its motion to strike and its reply in support of the motion to strike that it was seeking, in the alternative to disqualification, additional questioning about the juror's social media posts. Those questions could have been asked easily. Indeed, it was constitutionally necessary for the district judge to ask those questions in this capital prosecution. If the panel has no questions at this time, I'll reserve. Thank you. At this time, Mr. Glasser, please introduce yourself on the record to begin. May it please the Court, William Glasser for the United States. The district court did not abuse its broad discretion  in the challenged juror's question and reply did not suggest the kind of bias that would require further inquiry. The standard, as I think the parties agree on, is whether or not the defense has made a colorable or plausible claim of juror misconduct, at which point the district court has a duty to conduct some level of investigation, although, again, the district court has broad discretion with respect to the nature of that investigation. In this case, the defense was not able to produce even a colorable or plausible claim of juror misconduct as opposed to mere inaccuracies in the questionnaires or potentially in the voir dire. I'm not sure I follow that dichotomy. If we know that an answer is inaccurate, then don't we need to know why it was inaccurate before we know whether it was evidence of some bias? In other words, it could have been a mistake, could have had some innocent explanation, but it could have been covering up to try to get on the jury to complete a mission that the juror was on. How do we know that when all we know is that a juror was asked, did anyone comment on this trial, and he says no, and then we have what appears to be, at least as the other side sees it, a comment on the trial? Don't we need to know why he said no? Your Honor, I don't think that a court invariably needs to know why someone said no, why someone answered the question they did to conclude that it doesn't go to that second McDonough prong and demonstrate bias that would require a strike for cause. How could you? Take juror 138. He receives a comment on Facebook instructing him from a friend to play the part so you get on the jury and then send him, as a juror, send him to jail where he will be taken care of. So that's the comment he gets on January 5. Eighteen days later, he's asked under oath whether he received any comments about this trial, and he says no. Doesn't it plausible to say that that's a flatly inconsistent answer, and doesn't Sampson and French then suggest we need to know why he gave an answer like that in order to judge whether it's a sign of bias? Your Honor, I don't think that this Court's decisions, such as French, require that a district court, again, invariably can determine why someone gave the answer that they did. In other words, it is possible without calling the juror back in and determining why you answered a certain way you did to conclude that it's not something that goes to bias. I think in this situation, it would take the sort of blackest interpretation of the record to believe that juror 138 was lying as opposed to failing to recall or misunderstanding the district court's question. Stay with that for just a second, and then Judge Thompson has a question. When we look at the comment that was made, play the part to get on the jury and then send him to jail where he will be taken care of, when that's the comment that he's denying occurred, doesn't the very nature of the comment suggest, at least at a plausible or colorable level, which is our test, that the reason he answered no is it would interfere with him to get on the jury? Your Honor, no. I don't think it does, and for a few reasons. First of all, I think the context of the Facebook friend's comments here clearly show joking around. They're sort of making fun of the juror, saying if one look at you and you've got no chance, that sort of thing. So it just isn't the case that someone who receives those kind of comments from the friends that he didn't appear to take seriously would, based on those comments, determine that he had a mission to try to lie to get on the jury. In fact, I think his other statements in his questionnaire and in the individual voir dire show that he was not, in fact, lying in attempts to get on the jury. For example, he disclosed in his questionnaire the fact that other people had expressed jealousy when they knew that he had been summoned for potential juror service in this case. He indicated in individual voir dire that he was, in fact, pretty interested in the events of the marathon at the time, that he was watching them on television. And again, in answer to question 21, which is a sealed matter, he disclosed information that he might well have believed would prevent him from serving on the jury. So the other facts on the record don't support the notion that these apparently jesting comments by his Facebook friends motivated him to lie to get on the jury. And I think additionally, getting back to the knowing dishonesty as opposed to a mere inaccuracy question, the question that the district court asked 18 days after he had appeared and 18 days after the Facebook post, the question that the district court asked about other people commenting came up not in context with him communicating about this trial but at a separate point in the individual voir dire when the district court was just asking about his social media use in general and he said, I look at Facebook when I'm sitting in the work truck and I don't have anything else to do. And that's when the district court asked, anybody commenting about this case? And he said, no. So the question in that case didn't... You agree that was inaccurate, I take it. Your Honor, I think, yes, it's fair to say that it was inaccurate. If you understand this case or this trial, excuse me, which was the district court's word for this trial, as you pointed out earlier, Judge Gowda, this trial, if you understand it broadly to include the jury selection process, then yes, I think arguably it would fall within that. Well, but the second half of the question went to more than the jury selection process. Sent him to jail, that's what, and he will be taken care of. In other words, he's talking about what he was to do once he was on the jury. Right, Your Honor. So that would be the trial. Yes, Your Honor, it would be. But even if the question can be understood that way, this court has made clear and the Supreme Court made clear in McDonough that jurors don't always understand questions with the kind of precision that we would expect from lawyers, particularly in the face-to-face with the district court judge, the context of the questioning. The juror just might not think that that was something called for, particularly since this was something that occurred 18 days prior. The district court was asking about his Facebook use in general and not his Facebook use specifically about this case. So for those reasons and the reasons that I gave from the record, there's just no indication in this record that the inaccuracies were, in fact, the kind of knowing dishonesty that would lead to his disqualification. And I think this court's decisions... It's hard to understand why that at least is not a plausible or colorable claim. I mean, if, for instance, the Facebook friend had said, get on the jury and make sure that the death penalty isn't imposed, it's hard for me to believe that you wouldn't be in here instead of what you're arguing now. Why wouldn't that be joking around easily as much as what you're asking us to just consider joking around? Your Honor, I think the government's view, and I know we've taken this position in other cases, is that statements on voir dire should be given a much higher priority than any sort of statements that someone might make on social media. So I don't think we would be arguing that these kind of comments should be elevated above the assurances of a juror that they could fairly consider the evidence and determine whether or not the death penalty was appropriate. And so our view is that the questioning that the district court took in that face-to-face individual voir dire, that that was the appropriate consideration in your example as to whether someone could actually apply the death penalty as opposed to comments that they might have made or received on social media at some point in the past. When you have information that seemingly contradicts what they're saying during voir dire, it's a problem. It seems to me to at least be colorable or plausible. So, Your Honor... And without knowing any more information, how do you get at what doesn't... is it reflexive of bias? So, Your Honor, we would agree that there would be a colorable, plausible claim of inaccuracy, if that were the standard. But inaccuracy alone is not enough. As this Court's decisions have made clear, the standard is whether or not there is an inaccuracy that was intentional or knowing misconduct, that is, dishonesty. So, for example, in French 1, this Court distinguished between those two showings, saying, here the defendant came forward with factual information fairly establishing that juror 86 likely gave an inaccurate answer to question 3 on the written questionnaire. And then the Court went on to say, further, the uncontested facts submitted by defendants also make it quite likely that the jurors... It's quite likely, although not certain, that the jurors' inaccuracy was knowing. So, there are two different questions. There is the question of inaccuracy, and then there's the question of whether it was a knowing dishonesty that would rise to the level of potentially being... indicating bias. And, in fact, even a knowing... The Supreme Court made clear in McDonough, even knowing dishonesty is not necessarily... does not necessarily lead to a valid strike for cause. But that doesn't help you, under the plausibility standard, that it doesn't necessarily lead. The standard is just the opposite. We have to ask, is... We see a question point-blank asked by the judge to which he says no. The defense then gets evidence that that is simply wrong. And we don't know why. And the issue is, it seems to me, French says, ask the juror why. And if you find out that there's an innocent explanation, or even if you find out it was dishonest but it doesn't go to bias, then your point would prevail. But we never got to that point in this case because no one called the juror, who was just in another room in the courthouse, to come down and tell me, how come, given you got this comment, you said no? Maybe he would have said, I forgot, or I read it differently. He would have said one of the things you said, and we'd have no problem. So, Your Honor, again, the district court had broad discretion, and the district court's discretion was based on its own face-to-face voir dire with these jurors that had already occurred. Granted, the voir dire didn't involve questions about this specific social media use. But even if we were to assume that the defense made the necessary threshold showing of a colorable or plausible claim, the district court still had broad discretion with respect to the type of investigation that it conducted. And this court has never held that an evidentiary hearing, or in this case, additional voir dire, is always necessary. In French, it concluded, under the facts of that case, including the high likelihood of knowing dishonesty, concluded that it was an abuse of discretion to not conduct further inquiry. Here, the district court did conduct further inquiry. It just, that inquiry did not involve actually calling those jurors back into court. So even if they were able to satisfy that threshold showing, however, that this court is still reviewing for abuse of discretion, the district court's decision as to how to conduct the appropriate inquiry. The district court indicated that it had re-read the questionnaires, that it had reviewed the transcripts of voir dire, in which it had seen these jurors face-to-face, and that it had considered the party submissions, which included all of these social media statements. And the district court, after examining those things, concluded in its discretion that with respect not just to these two prospective jurors, but with respect to all seven that were challenged by the defense, four or five of them just the week before the jury selection was to take place, the district court concluded that these were collateral matters that didn't go to the kind of bias or impartiality that would require striking them. Suppose the judge had called the witness down, and the witness said, yeah, I answered. I knew that was a false answer, but I didn't think it was too big a deal, and I was afraid if you saw those comments from my friends, I wouldn't get on the jury. So that's why I said no. Your Honor, in that case, I think there would be an argument on both sides. The parties would argue to the district court this requires a strike for cause. It doesn't. I think even that would still be well within the district court's discretion to deny a strike for cause if that kind of answer were given. But, again, that's pretty far from the facts here, where nothing else in the record indicates that either of these challenged jurors. Well, that's only far from the facts because the witness wasn't asked the question that I posited. Well, fair enough, Your Honor, but there's also nothing else in the record. In fact, there are contrary indications in the record to suggest that neither juror 138 nor 286 were lying to try to get on the jury because, as I mentioned, juror 138 made those additional disclosures. I can talk about juror 286 who also made disclosures indicating that undermine any idea that she was lying in an attempt to get herself on the jury. So, again, in that case, though, even assuming that kind of sort of admission. Trying to get on the jury is one thing, but the issue is does that person hold positions that prove that they are unable to be fair and impartial? And when the jury foreperson says that the defendant is a piece of garbage, passes along a retweet, republishes, that certainly expresses a position as to the person who's going to be on trial before her. Your Honor, I think this would be a different case if the juror 286 had said, on individual voir dire, yes, I think the defendant in this case is a piece of garbage, but this is a long way from that. As you mentioned, it's a retweet. The only argument here is not that that retweet in and of itself made her ineligible to serve. The only argument that the defense has raised is that she lied about that retweet by failing to disclose it 20 months after she retweeted it when she filled out the jury questionnaire that asked her whether or not she had commented on this case in an online post, a letter to the editor, or to a talk radio show. So there are many reasons why she would not have recalled that, why she wouldn't have understood the question to be asking her about retweets that she made 20 months before. And so it's a long way from her actually saying, I think the defendant is a piece of garbage. Moreover, as we point out in the brief, the focus of the retweet was congratulating law enforcement personnel, and although it characterized the defendant as a piece of garbage, again, at the time of the trial, which is the important inquiry here, the juror 286 assured the district court, and the district court implicitly credited these assurances, that she could be fair and impartial in determining whether or not to apply the death penalty. Can you think of any good reason why the government counsel sitting there opposed the judge calling the two jurors in from the other room and asking them, why did you answer these this way? So, Your Honor, I can give some reasons. One of the reasons is that the defense continued to... The reason that occurs to me is, having seen the answers, the government counsel darn well wanted those people on the jury. Your Honor, I don't think that's certainly not the only explanation. I think the more likely explanations are the ones that the government gave in its omnibus response to these seven motions. And the reasons that the government gave there were, first of all, that these were untimely. So the defense had opportunity to ask in-person voir dire questions to prospective jurors about their social media. They did that with respect to quite a number of jurors, prospective jurors. So they had that opportunity. And then after the district court had completed a long 21-day voir dire process in which 256 people had come in, the defense continued to file additional motions to strike for cause based on sort of further mining the social media. And the government opposed based on timeliness, and the government opposed based on the fact that not only with respect to these two jurors, but with respect to all of them, they were not the kind of things that went to bias and would require the district court to strike them for cause. So those are the stated reasons, the government's stated reasons for opposing, and I think that those were valid reasons. And the district court didn't abuse its discretion in concluding that further inquiry was not necessary. The information in French came to the defendant's attention post-trial. So when you argue timeliness, it's when after due diligence, it's when the matter actually comes to the attention of the defendant. Yes, Your Honor, we haven't actually raised timeliness on appeal as a specific basis to affirm here. We think it was, you know, the district court had discretion to consider the timeliness, but that was one of the bases that the government relied upon below. We acknowledge, though, that raising that, that even if it was untimely in the sense that they should have found it earlier, they did raise it at a time in which the district court could have conducted additional voir dire. So we're not specifically relying on timeliness now, but we think that it was a valid basis upon which to rely below and that the district court could take that into account in exercising its discretion. That confuses me. You say it was proper to raise it below, but you're not relying on it now? We're not relying on it independently, Your Honor. We didn't make an independent argument that this court should affirm because these motions were untimely. We're arguing the district court didn't abuse its discretion for a variety of reasons, and the primary one being that these are the sort of things that go to bias or impartiality. But do those reasons include timeliness? Your Honor, yes, I think they include timeliness, but we're not relying on that. I don't think to any great extent on this appeal. I would like to briefly address, if I could, the defendant's reliance upon this court's decision in O'Brien, which does not stand for the proposition that any discussion with someone about the topic of a case leads to a presumption of prejudice. So O'Brien did use one confusing sentence that seems to indicate that simply communication about the case, the subject matter of the case, could lead to prejudice. But, in fact, if you look at O'Brien carefully, it actually said that unauthorized private communication between jurors and persons associated with the case is presumptively prejudicial. And O'Brien involved communication with a law enforcement, a juror communication with a law enforcement witness. So O'Brien does not stand for the proposition that simply any communication, such as in the example of Juror 138, the communication with his friends about the subject matter of the case would lead to a presumption of prejudice. Do you think we should distinguish between, I think, what are called tweets and retweets in terms of the significance of, in the context of this case, of whether she was commenting on the case? Yes, Your Honor, I do think that distinction is relevant in a few ways. First of all, although the defense disputes this, when someone retweets something, they aren't necessarily endorsing everything that is in that tweet. It is, in fact, common for some people to put on their Twitter profiles that a retweet doesn't equal an endorsement. We think that's sort of just generally understood in the nature of Twitter. But I think, more importantly, the question in this case asked whether, asked Juror 286, whether she had, quote, commented on this case in a letter to the editor, in an online comment or post, or on a talk radio show. And when she's answering that question, to the extent she even recalled these 22 tweets, 16 of which were retweets, she may well not have considered the retweets to be, A, her comments, B, on this case, or C, something that rose to the level of being equivalent to a letter to the editor or calling into a talk radio show. So we do think that the fact that there were retweets is significant for that reason and that it's not something that she would be likely to recall and answer in response to that question. And again, the issue here is not sort of whether the retweets in the ether show that she was biased. The question is whether or not the defense is only relying on a juror dishonesty claim, that is, a claim that she lied, affirmatively lied, when she answered, I don't believe, or don't believe I have, in response to that question. So we do think that that is a fair and useful distinction to make in this case. And again, if I can just return to where I started, that this court in French and in Zimny has not just looked sort of in general about whether a plausible or colorable claim has been established. It has broken out whether there's a colorable or plausible claim with respect to each of the relevant facts. And so although there's a colorable or plausible claim of inaccuracy in this case, we don't think that the defense has shown a colorable or implausible claim with respect to knowing dishonesty. But even if they had, the district court still had broad discretion in the type of inquiry that it conducted, and the district court conducted an adequate inquiry here. In making this evaluation of the inquiry undertaken by the district court, you've cited French and Zimny. Does it add anything to know that this is a case involving the death penalty, and that's what at issue, and so Sampson becomes more directly on point? Your Honor, I don't think it does. And the reason for that is that the right at issue here is the right to an impartial jury, which is guaranteed by the Sixth Amendment. And that applies in every federal criminal case. It applies in state cases too, at least by virtue of the Fifth Amendment and Fourteenth Amendment. And so the fact that this is a death penalty case, although that leads to different questions when it comes to qualifying a jury, death qualifying a jury, certain questions have to be asked to ensure that they can actually impose or will not reflexively impose the death penalty. With respect to the impartial juror guarantee, I don't think that it matters. Let me make sure I understand what you're saying. So you're saying that in a case in which the government proposes to put the defendant on to death at the end of the proceeding, a death penalty case, you do not think or you urge us to hold that the government need not be any more cautious in making sure that a jury is fair and unbiased than it would in any other criminal case? Your Honor, that's correct, and I think it's because we don't have any constitutional basis to do so. The government is obligated to, and courts are obligated to, seek and ensure a fair trial with respect to anyone, regardless of whether or not they face the death penalty. And if I could just point the Court's attention to two cases in which this Court has actually found that this threshold showing of a plausible or colorable claim was not met. So one of those cases is United States v. Both of these cases are cited in the defense's opening brief and are cited in this Court's Zimney opinion. The first is United States v. Mukotowicz from 2004, in which the Court concluded that some references by the jury foreperson to the second day and deliberations taking place on the second day did not suggest premature deliberations because although it could have referred to the second day of trial, it also more likely referred to the second day of jury deliberations, and the Court found that that colorable or plausible standard was not satisfied. So the jury deliberations would not be part of the trial? Your Honor, I don't think that's actually the import of that case. I think what the Court concluded was that it didn't suggest, just the offhand reference to second day didn't obviously suggest that the jury began deliberating before it was supposed to. And then the second case is Neyron v. Tierney from 1988, which involved a pre-AEDPA state habeas claim where the Court concluded that a juror's, the fact that a juror had, there were allegations that a juror had dated the defendant's son at one point, had a romantic relationship with the defendant's son, did not require recalling that juror because the Court concluded that there were not allegations that the juror had ever known the defendant in that case. And so that was another instance in which this Court found that further inquiry wasn't necessary, even at that sort of threshold, colorable or plausible claim showing. If the Court has no further questions, we're happy to rest on the briefs and ask the Court to affirm. Thank you, Mr. Glazer. Thank you. Thank you, counsel. At this time, Attorney Habib would reintroduce himself on the record to begin his rebuttal. Daniel Habib on behalf of Jahar Sarnaev. What the government has done in its briefing and has continued to do today is hypothesize a series of innocent explanations for why these jurors gave inaccurate answers to material voir dire questions. This Court has said that it is not the office of the District Court to assume innocent explanations, but to develop facts on the record. And in this Court, it is not this Court's office to simply credit innocent explanations and affirm on that basis. The fact is we do not know why two jurors gave what I now understand the government to accept were inaccurate answers to key questions bearing on those jurors' fitness to serve. Not only Juror 138's statement that none of his Facebook friends were commenting on this trial, which one of them and more clearly were, but in addition, Juror 286's statement that she had not sheltered in place and her family had not sheltered in place, when clearly both had, in a context that the juror contemporaneously described as emotionally traumatic. Two seated jurors in this capital trial who held in their hands the life of a teenager who committed these crimes gave inaccurate answers to important questions. And the best that the government has done in this Court is guess at or posit acceptable explanations. What do you say about this concern, which I see, if not expressed, but throughout the government's brief, which is when you take what happens now in the world of social networks with Facebook commenting, tweets, and you add in how prevalent that is and the tone and attitude and quickness and casualness with which people do it, and then you combine that with the increased sophistication, depth, and quantity of what your questions and juror questionnaires that are asked, you could get to a point where you could almost always find some inconsistency between something that's tweeted or retweeted and something that's said in the questionnaire. And then we would always, at the end of every criminal trial, be engaged in these investigations. What do you say to that concern that we would be opening floodgates here? This Court, to resolve this case, does not need to opine on voir dire for all purposes, in all cases where social media is implicated. Rather, it's a sufficient basis to dispose of this case to conclude that on these facts, where jurors were asked direct questions with bearing on their fitness to serve, where the answers happened to implicate, true, the juror's social media use, but really went to core questions such as prior opinions about the case, the emotional effect of being, in a real sense, the victim of this crime, and extrinsic influences, where the evidence, powerful evidence, to support the allegations of misconduct and bias were unearthed on social media that it was incumbent on the District Court at least to ask. You've described as a core question the question of the juror 138, and the question was simply anybody commenting on this trial. How is that a core question? Because if a juror, in a case that attracts enormous pretrial publicity, and as to which residents of the community have very strong opinions, including opinions that reflect animus toward the capital defendant, whether someone had commented on the trial could have direct bearing on whether the juror could reasonably be expected to put those opinions aside and reach a reasoned moral judgment. But did you really think for a second that any one of these jurors had not heard some voiced opinion strongly felt against the defendant? What I know is that this juror, after he had been instructed to avoid discussion of this case on Facebook, went to Facebook, engaged in discussion of this trial, and was urged by a friend to vote a specific way to impose punishment on a capital defendant. And when he was asked whether that had occurred, he said that it had not. Counsel, I don't mean this as an unfriendly question. I'm just curious as to what you have to say about it. As the government has mentioned, Juror 138 did disclose that he had spoken with others or communicated with others, and he did disclose that others were jealous, the suggestion there being that he was not intentionally dishonest with a nefarious purpose. How do you respond to that? And why couldn't the district court simply have stopped there? If I may, Your Honor, that disclosure bolsters our point. What the juror disclosed was a conversation that occurred at a time when no order prohibited him from discussing the case. And when the juror referred to jealousy, it became clear, after additional voir dire, was that what he meant was that his uncle, in particular, would have been excited about what he called an action-type event. He would have been locked in. He would have been interested in a proceeding. By jealousy, it was not meant that these family members were jealous that they, unlike Juror 138, did not have the opportunity to punish Tsarnaev. And so the question, to answer Your Honor's query, is why a juror would disclose an innocuous conversation more distant in time, made at a time when he was not subject to a court order, but failed to disclose a more recent conversation in response to a direct question calling for that information. I see that I'm over, but I'm happy to answer additional questions from this Court. No. The Court has no more questions for either counsel. We do express our appreciation to both counsel for some excellent briefing and very helpful argument today. That concludes argument in this case.